In re Estate of Richard T. Crane, Jr., Deceased.
Luke Petre, Appellee, v. John K. Prentice and Continental Illinois National Bank and Trust Company of Chicago, Appellants.

Gen. No. 39,477.

Opinion filed December 14, 1937.   Rehearing denied December 28, 1937.

574

Ashcraft & Ashcraft, of Chicago, for appellant; Russell F. Locke and William H. Alexander, both of Chicago, of counsel.

Bell, Boyd & Marshall, Romney Spring and Thomas L. Marshall, of Chicago, for appellees.

Mr. Presiding Justice Friend delivered the opinion of the court.

Luke Petre, petitioner, and five others whose cases are pending here on appeal (Nos. 39,478 to 39,482, inclusive) and have been consolidated with this case, filed their petitions in the probate court *In the matter of the estate of Richard T. Crane, Jr., deceased,* praying that the court direct the executors to pay each of them the respective amounts claimed to be due them as intended beneficiaries under art. 5 of decedent's will. All the petitions were considered *de novo* by the circuit court, and after an extended hearing separate orders were entered as to each petition, finding that the assets of the estate were ample to pay all legacies under art. 5 of the will; that petitioners were servants in the personal employment of decedent at the time of his death and fixing the total respective amount of each petitioner's wages; that Richard T. Crane, Jr., did, under art. 5, bequeath unto each petitioner the respective sums fixed in the various orders; and the court ordered the executors to pay petitioners, with interest, in due course of administration. Six separate appeals were prosecuted and the cases were consolidated on appeal and argued orally as one proceeding. Except as to the names of petitioners and the respective amounts awarded them, the petitions and orders in five of the cases are substantially identical. The appeal from the award in favor of Robert K. Low, although consolidated with the others, presents circumstances somewhat different and will be treated separately in the course of this opinion.

Richard T. Crane, Jr., died November 7, 1931, leaving a last will and testament containing the following provision: "Fifth: I give and bequeath to each servant in my personal employment at the time of my death a sum equal to the total amount of such servant's wages as such from the time of entry into my service to the date of my death." The question presented is whether petitioners were *servants* in Crane's *personal employment* within contemplation of this provision of his will. The record on appeal consists of some 1,700 pages, and although there is substantially no conflict in the evidence the issue in controversy resolves itself into an interpretation of the facts as bearing upon the provision of the will in question.

Mr. Crane was a resident of Illinois and had for many years preceding his death been active as president in the affairs of Crane Company. He left an estate of approximately $40,000,000 and was survived by a widow, a married son, and a daughter, who were made beneficiaries of the residuary part of his estate. In addition to his Chicago home he owned and maintained an estate on Jekyl Island, off the coast of Georgia, where he spent considerable time during the winter months. He also owned and maintained a large summer estate at Ipswich, Mass., where he spent considerable time during the summer. This property covered some 1,900 acres of ground overlooking the Atlantic ocean, with a seven mile beach. The original piece of Massachusetts property was acquired by decedent in 1911, and was known as Castle Hill. It was improved with a magnificent mansion, barns, garages, gardens and other appurtenances of an extensive country estate.

As distinguished from the property known as Castle Hill, two contiguous pieces of property were subsequently purchased by Mr. Crane, known as Sagamore Hill and Haskell Farm. During the year 1925, Haskell Farm was improved by decedent with a nine-hole golf

course. In 1928 he conveyed title to the property which contained the golf course to his daughter, Florence, reserving therein a life estate to himself. He bought other properties in the vicinity, identified as islands lying near the Castle Hill property, and in 1928 he conveyed these to his son, Cornelius, likewise reserving to himself a life estate therein.

Until the date of his death the property known as Castle Hill was managed by one Robert Cameron, as superintendent, who hired, discharged and directed the work of some 30 employees engaged in tending the stock farms, gardens and landscapes known as Castle Hill. The servants employed within the mansion were under the direction of John K. Prentice, personal secretary of Mr. Crane, and paid by him.

With the assistance of a landscape architect and his superintendent, Mr. Cameron, Mr. Crane directed the building of the nine-hole golf course on Haskell Farm in 1925. Petre, Low and I. Blonda, petitioners, employed as laborers around Castle Hill, were assigned to work under the direction of Cameron in the construction of the golf course on Haskell Farm and except in 1930 alternated in their work between the golf course and the property known as Castle Hill until testator's death, by working on the golf links during the period between April first of each year and the end of that year, and from the first of January until the first of April each year at Castle Hill. Petre's wages at the beginning were $3.50 a day, until the spring of 1925, when they were increased to $4 a day, and that of the other petitioners were substantially the same. While working at Castle Hill petitioners were paid by Robert Cameron, superintendent, and when they worked at the golf course they were paid by Robert K. Low, golf professional employed by Mr. Crane at the golf club.

Early in 1927 decedent sent out invitations to local residents around Ipswich to attend the opening of

"Labor in Vain Country Club," a name given to the golf links by Mr. Crane. These invitations were sent to about 100 people, inviting them to become subscribers to the country club, the subscription fee being $25 a year for each person. Some 50 local residents accepted these invitations, subscribed for membership and paid their $25 subscription fees, which entitled each subscriber to unlimited privileges of the use of the club and its facilities during the current calendar year. Similar invitations were issued each succeeding year, up to and including 1931, and an increasingly larger number of residents subscribed during succeeding years.

In 1927 four men, together with Mr. Crane, were designated by him as a membership committee whose duty it was to consider and pass upon all subscribers' applications for membership in the club, and the committee was governed by a rule that the affirmative vote of any four of the five would be an acceptance of a subscriber's application. This committee continued in existence and functioned until 1931, and other committees, including a tournament committee, took active part in the affairs of the club.

The golf course was improved with a main building which offered sleeping quarters and dining room facilities and was managed by the widow of an old friend of Mr. Crane's, who was identified as the hostess and employed by Mr. Crane. There was also a caddy shop, where customary services were rendered for members of the club. The caddy house was operated and managed by Robert K. Low, one of the petitioners, engaged as a professional and superintendent of the golf course by Mr. Crane early in the year 1927. In addition to his salary Low's earnings were augmented by payments for services rendered as a professional and the sale of golf supplies. This was by arrangement with Mr. Crane.

Charles Goodhue, Jr., designated by decedent to act as secretary and treasurer, continued to act in that capacity until the death of Mr. Crane. He established and maintained a set of books for the club. All income, including subscription payments and receipts from the clubhouse were turned over to Goodhue, who deposited them in the account of Labor in Vain Country Club in an Ipswich bank. Bills for materials and services rendered to the club were all paid by Goodhue through checks drawn on the Ipswich bank, and Goodhue's books reflected an accounting of all receipts and disbursements had and made.

Bills for the construction of the club and for all major improvements were paid by Mr. Crane through his secretary, John K. Prentice, who kept a special set of books for these particular expenditures, charged to capital account. The evidence discloses that there was an annual operating deficit for the club, in excess of $8,000, which was paid by Mr. Crane through his secretary, Prentice, and by Prentice charged on his golf club book to operating account.

Counsel for the executors argue that on the date of Mr. Crane's death petitioners were employed by the Labor in Vain Country Club, an association of residents of Ipswich, Mass., of which Mr. Crane was a member, and that petitioners were not in Mr. Crane's personal employment at the time of his death, but were "working for each and every one of the members of the association known as Labor in Vain Country Club." Petitioners on the other hand contend that Labor in Vain Country Club was a mere name given by Mr. Crane to his private golf course, which was constructed, maintained and operated by him as such, and that Petre and the other petitioners, including Low, were in the personal employment of Mr. Crane in the operation of that part of his Ipswich estate. In support of this proposition petitioners' counsel have listed

and discussed numerous salient items of evidence, which may be briefly stated as follows:

Mr. Crane's mansion was located on Castle Hill. It included a swimming pool, Italian gardens, extensive lawns and landscaping. Sagamore Hill section adjoining was used as a farm. The golf course was constructed on Haskell Farm, and there were drives connecting these three separate parcels which constituted his whole estate in Ipswich. Mr. Crane gave to his golf course the name Labor in Vain Country Club, and to the drive leading through that part of his estate the name "Labor in Vain Road." A small creek running through that part of the estate also bears the name "Labor in Vain Creek."

When the golf course was completed Mr. Crane gave an opening party at the reconstructed farm residence on the golf course known as the clubhouse, to which he invited his friends and neighbors. The printed invitations read: "Mr. R. T. Crane, Jr., invites you to attend the opening of the Labor in Vain Country Club Saturday, June eleventh, nineteen hundred and twenty-seven. . . ." He confined the invitations to residents of Ipswich. In order to obtain a desirable selection he enlisted the assistance, without compensation, of Charles E. Goodhue, a resident of Ipswich, whom he designated as secretary and treasurer. Later Mr. Crane named a committee consisting of himself, Goodhue and three other residents of Ipswich, to pass upon subscribers who might apply. During each year subsequent to 1927 his selected list of Ipswich residents to whom the facilities of the club were extended upon payment of a nominal season fee of $25 was then made up and Mr. Crane himself went through the form of paying such fee. The aggregate proceeds of these subscriptions amounted to only a small percentage of the operating costs, and the deficit was annually paid by Mr. Crane. The invitations were not extended "to

join" any club, but the recipient was "invited to become a subscriber of the Labor in Vain Country Club for the summer season" of that year.

Under the name Labor in Vain Country Club, Mr. Crane established an account in the First National Bank of Ipswich. Goodhue, as treasurer, drew checks against this account for current operations and deposited the payments of subscribers as well as the substantial amounts of cash received from Mr. Crane as currently needed. In the same bank Mr. Crane maintained a separate account drawn upon by Robert Cameron, superintendent, for farm expenses, and also another account drawn upon by his secretary, John K. Prentice. Goodhue was apparently always subject to instructions from Mr. Crane or his secretary, Prentice, consulted Crane or Prentice as to any unusual items, reported currently to Mr. Crane, and asked for cash remittances as needed.

Labor in Vain Country Club was never organized as a corporation nor as any legal entity, had no president or board of directors; the subscribers never met as a body nor were they ever consulted about management or expenditures; they never authorized anything nor did they ever elect or choose any committee or anyone to speak for them. No financial statements were ever furnished to them. Mr. Crane promulgated a rule that only residents of Ipswich could become subscribers and he named and appointed the so-called membership and tournament committees. The use of the facilities of the golf course was only on express invitation, and Mr. Crane refused to give many suggested invitations. Instructions and directions as to the operation of the club came solely from Mr. or Mrs. Crane, or Prentice, and never from any subscriber. Decedent or his secretary determined how many men were to be employed on the course, how long they were to be employed, when the course was to be opened, and what the men were to be paid.

In March, 1931, the status of the club was brought into question through correspondence with the collector of internal revenue, who sought to ascertain whether "subscribers' dues" were subject to the Federal tax upon club dues. In this connection Mr. Thomas W. White, collector, wrote to Goodhue March 27, 1931, as follows: ". . . From the information which you furnished verbally it appeared to this office that there was no liability on the part of the Labor in Vain Country Club under the club dues section of the law. This office understood that there is no club or organization; that the clubhouse and golf course are owned and operated personally by Mr. Crane at his own expense; that he invites persons to subscribe for clubhouse privileges and golf upon the payment of $25 for a single person and $50 for a family; that the amounts thus realized are not sufficient to cover the cost of running this place and that any deficit is made up personally by Mr. Crane. Further, that there is no actual membership, no voting privileges and no action is taken by any person towards admitting anyone to membership; that merely by payment of the fee for the privileges, persons are permitted to use the clubhouse and golf links." On confirmation of this letter by Goodhue, White, collector of internal revenue, closed the matter in another letter to Goodhue, dated April 3, 1931, by saying: "Since there is no club or organization and the amounts paid are merely paid to an individual who operates and maintains the equipment it is the opinion of this office that the amounts paid are not dues or membership fees within the meaning of the club dues sections of the law and that accordingly there is no liability to tax on such payments."

Another item of evidence discloses that during the entire operation of the golf course up to the date of testator's death, Mr. Crane was the insured under policies of Workmen's Compensation and Liability In-

surance covering all Mr. Crane's employees at his Ipswich estate, including these petitioners who worked on the golf course. Mr. Crane paid the premiums. In a letter dated February 8, 1928, respecting this insurance, written by Marsh & McLennan, brokers, to J. K. Prentice, Mr. Crane's secretary, in response to Prentice's letter of February 3, 1928, they said: "We have discussed with the Zurich Insurance Company the question of Workmen's Compensation coverage on the cook, maid, ground keepers and other employees engaged in maintaining the club premises and they advise that no endorsement is necessary on Mr. Crane's compensation policy. . . . *They also explain that the Labor in Vain Country Club having no corporate existence is nothing but a name which Mr. Crane has given to a certain part of his estate, . . .*" (Italics ours.)

Before Mr. Crane's death three of the petitioners suffered injuries, the expenses of which were paid under these policies constituting the personal insurance of Mr. and Mrs. Crane, and in the report of these accidents R. T. Crane is designated as the employer of each petitioner, and Robert Cameron as the superintendent under whom they were employed.

It further appears from the evidence that when Mr. Crane died the tools and equipment of the golf course were inventoried by the executors as the testator's property. This included the caddy house, clubhouse, equipment, shed, kitchen utensils and supplies.

The Ford truck kept and used on the golf course was purchased by Mr. Crane in 1930, and during each of the years thereafter until his death it was registered and licensed under the Massachusetts law in Mr. Crane's name. Decedent also purchased the Chevrolet kept and used on the golf course and had yearly licenses issued to him in his name therefor. "No trespass" signs around the golf course bore the name of

R. T. Crane, Jr., and were in the same form as those appearing throughout the Crane estate.

The original pay receipts, signed weekly by the petitioners in the ordinary course of their employment during the years 1927 to 1931 inclusive, consisting of some 173 originals which were introduced in evidence, uniformly and without variation recite: ''Received of R. T. Crane, Jr.,'' unquestionably indicating, as we believe, that they were employees of Mr. Crane. There are numerous other items of evidence, too lengthy to embrace within the confines of this opinion, and all uncontroverted, clearly supporting the contention of petitioners that the Labor in Vain Country Club was a mere name given by Mr. Crane to his private golf course.

Upon oral argument counsel for executors argued that the word ''servant'' was confined to menials who had been in daily contact with Mr. Crane and served his personal wants; that words of general import must give way to words of special import; that ''personal'' qualifies ''servants,'' and means personal servants and not all people who work on his estate. Obviously this was not the construction placed upon art. 5 of the will by the executors themselves, because they have paid in legacies under art. 5 of the will to beneficiaries substantially $487,000, and the legatees to whom these payments were made included not only household servants, such as maids, laundresses, chauffeurs, cooks, porters and housemen, but also outdoor servants who worked on the estate at Ipswich where petitioners were employed, including carpenters, laborers, poultrymen, teamsters, gatemen and others. Forty of the servants included in this category were outside workers on the Ipswich estate at the time of Mr. Crane's death, and they ranged from superintendent down to common laborer. Their work was of the same general character as that of petitioners, and in paying their legacies the

executors have evidently recognized the meaning of the word ''servant'' as petitioners seek to have it construed.

Executors' counsel argue that although Mr. Crane created the club and contributed the property which the club used, nevertheless the Labor in Vain Country Club, such as it was, was not his personal estate, and they say that ''before Crane organized the club and before the club accepted any subscription fee, Crane might have done as he chose with the property. But, having permitted the organization of the club, and having permitted the club to accept subscription fees on certain representations, he thereby sold and definitely parted with part of what theretofore had been his own personal property.'' There is nothing in the evidence to warrant such a conclusion. The subscription fees were not accepted on any representations made, there were no conditions or obligations attached thereto, except the payment of a very nominal sum, and there is nothing to sustain the statement that he sold and definitely parted with part of what had theretofore been his own personal property. This calls into question Mr. Crane's motive in utilizing part of his estate for a golf course. The evidence is scant on this subject, but it is fair to conclude that his motive in inviting subscribers, was purely social, for, as petitioners' counsel point out a private golf course would not yield much enjoyment to its owner unless privileges of play were extended to his friends and neighbors. There is, however, the evidence of Robert K. Low, who testified that ''there were summer people and a good many friends of Mr. Crane's and he asked them to come and play. He charged them a small fee because he thought they would play if he charged something.'' Mr. Crane was undoubtedly interested in the Ipswich community. His will provided an endowment of a private hospital in Ipswich, and his so-

cial instincts undoubtedly prompted him to extend the privileges of his private golf course to his friends and neighbors in the community.

Counsel on both sides cite numerous authorities dealing with the construction of the word ''servant'' and the interpretation that courts have placed upon wills making similar bequests, but as we view the controversy the question whether the particular language of art. 5 was intended to include petitioners along with other servants depends entirely upon the circumstances of the case.

Counsel for executors invoke the familiar and well recognized rule that the intention of the testator must be ascertained from the whole will, and that no words used should be cast aside as meaningless. These propositions are well established and counsel for petitioners take no exception to the general principles of law established by the authorities cited in the executors' brief. Invoking these rules, we find that it was apparently Mr. Crane's desire to provide for all those who had been associated with him, not only in his business but also those who had contributed to his personal wants and comforts.

Mr. Crane bequeathed to every employee of the Crane Company, who had been in continuous service for 10 full years 10 shares of Crane Company stock and one share for each additional full year if such employee had been continuously employed up to and including 25 full years, and 2 shares of stock for each additional year in excess of 25 years. He also bequeathed 5,000 shares of Crane Company stock to be used as a pension fund for his employees, and gave each director of the company 1,000 shares of Crane Company stock. These bequests, taken together with the fifth clause of his will, indicate that it was his desire to provide for those who had served faithfully in his business enterprise, as well as his servants.

There is no fair basis for excluding petitioners, whom we believe to have been servants in his personal employment, engaged in the same general class of work as many other employees to whom bequests have already been paid.

Judge Trude of the circuit court in announcing his decision commented specifically on the case of *In re Cassel* (1922) 39 Times Law Reports 75, wherein the testator was a man of great wealth and had many establishments. His will made provision for "every other clerk or servant who shall be in my employ at the time of my death." The question arose as to whether four persons, one of whom was manager of testator's farms, at a yearly salary of 370 pounds plus a profit sharing arrangement, another who was estate agent on one of testator's estates, at a yearly salary of 240 pounds, another who was manager of his racing stables, at a yearly salary of 1,000 pounds, and one who was trainer of his race horses, at a yearly salary of 1,000 pounds, were comprised within the term "servant," and the court said (39 Times Law Reports 76) : "The testator desired to benefit all persons who had ministered to his service, and in the case of a man of the extraordinary wealth of the testator many persons might be in the position of servants whose social position was entirely different from that of those usually ranking in the servant class. So, for example, the captain of a private steam yacht might, although a highly trained navigator, be for the purpose of such a bequest as this a servant. In his (his Lordship's) judgment, all four persons came within the designation 'servants' as used in the testator's will."

The argument of counsel for the executors that the "personal employment" provision of the law was intended to exclude the golf course workers evidently does not take into consideration that this private golf course, where Mr. Crane entertained his friends and

where he furnished golf and social facilities to his friends and neighbors, brought him into more personal contact with petitioners, who were constantly employed on the course and to whom Mr. Crane frequently gave directions, than with many of the other servants on his estate. There is evidence that he frequently conversed with these petitioners, that one of them caddied for him, that others worked around his barbeque entertainments and operated the traps for his son's skeet shooting equipment, and some of them transported Mr. Crane in and about the estate in their own cars. Their employment by Mr. Crane was personal to a greater extent than that of many of his other servants.

With reference to Robert K. Low, executors' counsel state that "he was, in no sense, a servant, either of Crane's or of the golf club." We find in the record that Low was engaged by Mr. Crane. His initial salary was $125 a month, approximately $4 a day, about the same scale paid to the other petitioners. His salary was later raised to $150 a month, and there is extensive correspondence in the record to show that Low negotiated for this increase through John K. Prentice and ultimately received it only upon Mr. Crane's approval, because Mr. Crane had promised him a raise when he was employed. Low's duties consisted in superintending the force of six or eight men who worked on the golf course. He was subordinate to Cameron and took orders from him. Although he is referred to as a golf professional, his work was similar in character to that of the other petitioners. In addition to supervising the workers on the course, he performed manual labor, mixed and dumped loam, attended to seeding, at times operated the tractor, cultivated the sod, attending to digging holes and weeding about the course, performed physical and manual labor at Mr. Crane's personal barbeques, operated the skeet shooting apparatus for Mr. Crane's family,

loaded and spread gravel, working with pick and shovel, cut and topdressed the greens, alone attended to the sprinkling through the nights, scraped and rolled tennis courts and transported tools. The argument that in addition to his salary he received fees for golf instruction, and the profits made from the sale of golf supplies, does not remove him from the category of a servant under the facts of this case. These extra emoluments obtained only between the middle of June and the middle of September were allowed him by Mr. Crane, who himself took golf lessons from Low, although as Low's employer he was not called upon to pay for them. His activities as a golf professional were in addition to his regular work and were relatively insignificant, as disclosed by the evidence. In conducting a private golf course, the privileges of which were extended to many of Mr. Crane's friends and neighbors, it was necessary to have a man such as Low around. He was, nevertheless, a servant in the personal employment of the testator within the provisions of the fifth clause.

The finding of both the circuit and probate courts after extensive hearings that petitioners were in the personal employment of Mr. Crane at the time of his death are abundantly sustained by the evidence. It is not contended that the finding is against the manifest weight of the evidence, and in fact executors' counsel repeatedly assert, and stated on oral argument, that the evidence was undisputed. Under the circumstances we do not perceive how the court could well have made any other finding. Therefore the judgment of the circuit court in this case and in each of the five consolidated cases, directing that the amounts found to be due be paid in due course of administration, is affirmed.

*Judgment affirmed.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.